USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: AUG 1 2 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Qube Films Ltd., Navid Soofi, and Matt Kelley Films, Ltd.,

Plaintiffs,

–v–

Bert Padell, Padell and Company, T.D. Bank N.A.,

Defendants.

13-cv-8405

OPINION AND ORDER

ALISON J. NATHAN, District Judge:

Before the Court is Defendant TD Bank, N.A.'s motion to dismiss Plaintiffs' Amended Complaint with respect to the claims asserted against TD Bank only, which include Plaintiffs' second cause of action for breach of fiduciary duty, fourth cause of action for negligence, fifth cause of action for gross negligence, and sixth cause of action for tortious interference. Defendants Bert Padell and Padell and Company have not moved to dismiss any of Plaintiffs' causes of action asserted against them. For the reasons set forth herein, Defendant TD Bank's motion is GRANTED and all claims against TD Bank are dismissed.

## I. BACKGROUND

The facts underlying the current dispute are somewhat complicated and must be set forth in some detail to fully understand the relationship among the parties and the events that give rise to this lawsuit. The facts as outlined here are taken from the Plaintiffs' Amended Complaint and are assumed true for purposes of the motion to dismiss. *Krassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

Plaintiffs Qube Films, Ltd., Navid Soofi, and Matt Kelley Films, Ltd. are film producers. Am. Compl. ¶ 2. In early 2011, Qube Films and Kelley Films obtained the rights to a script entitled "The Salesman," and both parties set out to secure the necessary funding so that the film could be produced. Am. Compl. ¶ 7. At some point, Qube Films and Kelley Films encountered Napoleon Grier of Napoleon Grier Enterprises ("NGE") who informed Plaintiffs that he could raise the funds for their film through his network of investors and that Bert Padell, an accountant and attorney in the film industry, could facilitate the structuring and implementation of the financing transaction. Am. Compl. ¶¶ 8-9.

In March 2011, Grier proposed a structure for the transaction, which would be completed with the assistance of Ark Capital Ventures, LTD ("Ark") and Vaughn Richmond. Am. Compl. ¶ 11. Padell's attorney, Bruce Baldinger, prepared a series of agreements for the transaction with the assistance of Grier and Padell. Am. Compl. ¶ 11. Under the agreements, Padell was to act as escrow agent for the funds and would be charged with receiving the funds and keeping the funds at TD Bank before distributing them for the sole benefit of New Co, a corporation created to produce The Salesman. Am. Compl. ¶ 11.

On March 8, 2011, NGE and Ark entered into the first funding agreement with Qube Films ("March 8 Deal Sheet"). Am. Compl. ¶ 12, Ex. 1. The March 8 Deal Sheet lays out the preliminary understanding of the parties with respect to the financing for the film. Ex. 1 at 2. As relevant here, the March 8 Deal Sheet states that "[Matt Kelley Films/Qube Films] will initially deposit the [Qube Films] investment, respectively, into an escrow account [ ] at TD Bank located at 90 Fifth Avenue, New York, NY 10011 ref. Bert Padell, IOLA Account pursuant to a mutually agreed upon Escrow Agreement. The escrow agent for this transaction will be Bert Padell." Ex. 1 at ¶ 2. The March 8 Deal Sheet also states that "[t]he escrowed funds will be released to the

NewCo in accordance with the Escrow Agreement." Ex. 1 at ¶ 5. The March 8 Deal Sheet is signed by Kelley, Grier, Richmond, and Soofi. Ex. 1 at 2. It is not signed by Padell or TD Bank.

Also on March 8, 2011, Matt Kelley Films, Qube Films, Ark, and Padell executed the escrow agreement referenced in the March 8 Deal Sheet ("Escrow Agreement"). The Escrow Agreement appoints Padell as the escrow agent who "shall open and maintain an account on the terms and conditions set forth herein [ ]." Ex. 2. at 1. It also provides wire transfer instructions to send the funds to Padell at his "TD Bank – Bert Padell ESQ. IOLA Account." Ex. 2. at 1-2.

The core of Plaintiffs' Amended Complaint is Section 5's description of how the escrow property was to be distributed. This section states that "Escrow Agent shall hold the Escrow Property in its possession and disburse the Escrow Property subject to the Depositor [defined as Matt Kelley Films and Qube Films] instructing Escrow Agent that the 'Conditions Precedent' are satisfied." Ex. 2 at 2. The Escrow Agreement then sets forth two conditions precedent. The first condition precedent states that "Service Provider [defined as Ark] shall produce to Depositor an acceptable Presentation [ ] of a bank instrument [ ] that is to be funded." Ex. 2 at 2. The second condition precedent states that "the 'Funding Bank Institution' [ ] shall, via e-mail and/or facsimile to Depositor, (i) take fiduciary responsibility for delivery of the [bank instrument], (ii) guarantee the execution of an irrevocable funding commitment for [$6,000,000.00], and that said amount will be deposited into 'Depositor's Designated Bank Account' [ ] in trust for Salesmen . . ." Ex. 2. The "Funding Bank Institution" is defined as TD Bank, 90 Fifth Avenue, New York, NY 10011. Ex. 2. Nowhere in Plaintiffs' Amended Complaint do Plaintiffs allege that Matt Kelley Films or Qube Films ever received or even sought an e-mail or facsimile from TD Bank to take fiduciary responsibility for delivery of the bank instrument, which is described as necessary for the condition precedent to be satisfied. Rather, Plaintiffs specifically allege that

"TD Bank . . . acting through its officer Cerwin Cox did *not* 'verify the authenticity of Conditions Precedent,' and take 'fiduciary responsibility for delivery of the [banking instrument,' via email or facsimile to [Qube Films and Matt Kelley Films]." Am. Compl. ¶ 33 (emphasis added). The Escrow Agreement also provides "Cerwin Cox" as the "[n]ame of officer of institution who will verify authenticity of Conditions Precedent to Depositor after Depositor's receipt of same via e-mail and/or facsimile, as provided for hereinabove." Ex. 2 at 3. But, as stated above, Plaintiffs do not allege that they ever received or even sought an e-mail or facsimile from Cox to verify the conditions precedent.

The Escrow Agreement goes on to state that "[u]pon Escrow Agent's receipt of Depositor's Instruction via e-mail or facsimile, Escrow Agent shall and is hereby authorized and directed to withdraw from the Escrow Account and pay as" set forth in the Escrow Agreement. Ex. 2 at 3. The remainder of the Escrow Agreement applies almost exclusively to Padell as escrow agent, covering such terms as his liability, compensation, resignation, indemnification, and rights, duties, and immunities. Ex. 2. The Escrow Agreement does not address the rights or responsibilities of the "funding bank institution," TD Bank. The only signatories are Soofi, Richmond, and Padell. Ex. 2 at 9-10. TD Bank never signed the Escrow Agreement.

Plaintiffs contend that they relied on the language contained in the Escrow Agreement, "TD Bank's role in the transaction, and the protection it provided in deciding to enter the Funding Agreements and transfer the QUBE Funds into the Escrow Account at TD Bank, subject to the terms of the Escrow Agreement." Am. Compl. at ¶ 16. They also allege that "[b]ut for the assurances of TD Bank's role as fiduciary, and guarantor, Plaintiffs would not have entrusted the QUBE Funds to Padell." Am. Compl. at ¶ 16. But nowhere in the Amended Complaint do Plaintiffs allege that they actually received any assurances from TD Bank.

Shortly after the March 8 Deal Sheet and Escrow Agreement were executed, Plaintiffs deposited $510,000 into the escrow account. Am. Compl. ¶ 18. Grier assured Soofi that $4.8 million in Ark funds would arrive by March 25, 2011 and asked Soofi to deposit an additional $700,000 into the Escrow Account and release the $500,000 then on deposit. Am. Compl. ¶ 18. This series of interactions apparently induced Soofi to sign the first amendment to the March 8 Deal Sheet (the "March 11 Deal Sheet"). Am. Compl. ¶ 18. The March 11 Deal Sheet provides that "Qube Films will release the [$500,000 in] deposited funds to cover investment banking and assignment fees in exchange for pre advice of $6MM bank instrument assigned in the favor of Qube Films – The Salesman to the designated escrow account . . . . Qube Films will release the $500,000 immediately upon receipt of the pre advice." Ex. 3 at 1. The March 11 Deal Sheet is signed by Kelley, Grier, Soofi, and Padell. Ex. 3 at 2. It is not signed by TD Bank.

In mid-March 2011, Qube Films deposited an additional $390,000 into the Escrow Account. Am. Compl. ¶ 19. Plaintiffs allege "[o]n information and belief TD Bank and Cerwin Cox were aware of these transfers of large sums of money into and out of the Escrow Account on or about the time they occurred, and were also aware of the identity of the parties and the nature of the Funding and Escrow Agreements including the duties Plaintiffs were relying on the Bank to perform." Am. Compl. ¶ 20. Plaintiffs do not provide any additional factual allegations in support of the contention that TD Bank or Cox were aware of the "nature of the Funding and Escrow Agreements."

Plaintiffs claim that "[b]ased on the Escrow commitments made by PADELL and TD Bank, Q[ube Films] executed the March 11 Deal Sheet (Exhibit 3) and then signed off on Escrow Instructions on March 14, 2011 (the 'Escrow Instructions') (Exhibit 4) that Defendants and/or NGE drafted and conveyed to [Qube Films], along with more promises of imminent

funding for the Project in a series of phone calls and e-mails." Am. Compl. ¶ 22. Plaintiffs do not allege what commitments TD Bank actually made to Plaintiffs, nor do Plaintiffs indicate whether TD Bank was a party to or otherwise informed of the alleged phone calls or e-mails.

The March 14, 2011 Escrow Instructions nowhere refer to TD Bank as a fiduciary. Ex. 4 at 1. The bank is instead referenced as a "regulated, insured 'Prime World Money Center' banking institution." Ex. 4 at 1. The Escrow Instructions state that "Partial Deposit of the monies specified above in the amount of [$510,000] have been deposited within the Bert Padell, CPA, Esq. IOLA Account and the balance of [$700,000] is due by March 16th 2011 into the same IOLA Trust Account." Ex. 4 at 1. They then provide that "[Ark]/NGE will present the [Qube Films] and its associated parties with a beneficial bank instrument . . . . [Qube Films] and associated parties shall make a determination of acceptance or rejection of the presented SWIFT via email to NGE." Ex. 4 at 1. The very next sentence states that "[u]pon acceptance of above mentioned Pre-Advice SWIFT, the QF and associate[d] parties consents [sic] to release of the escrow funds already in the IOLA account and any additional anticipated funds (on March 16th)." Ex. 4 at 1-2. Nowhere in these Escrow Instructions is it indicated that TD Bank was to review the "pre-advice" or offer an opinion as to its nature and quality. The Escrow Instructions are signed by Kelley, Soofi, and Richmond; there are unsigned spaces for Padell and Grier. Ex. 4 at 2. There are no unsigned spaces for TD Bank, nor did TD Bank sign the Escrow Instructions.

On March 15, 2011, Qube Films and Matt Kelley Films gave written instructions to release in full the amounts in escrow in accordance with a "pre advice." Am. Compl. ¶ 26 and Ex. 5. The written instructions are addressed to Grier, Richmond, and Padell—not TD Bank—and are signed by Kelley and Soofi. Ex. 5. Apparently, the pre-advice referred to in the March 15 instructions "turned out to be nothing more than a Swift message from a Russian bank . . .

simply stating – without any firm payment engagement or liability for either Bank – that a client of the Russian Bank . . . is ready to issue a standby [letter of credit] of $3 Million . . . in favor of an individual . . . who may wish to transfer $440,000 of that amount to an unidentified account with TD bank [sic] in Miami, Florida." Am. Compl. ¶ 30. To date, Ark and NGE have failed to procure any funding for the project and Padell is alleged to have released all $900,000 in the Escrow Account to entities controlled by ARK and NGE rather than New Co. Am. Compl. ¶¶ 28, 43-44.

## II. DISCUSSION

### A. Legal Standard

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all well-pleaded facts and draw all reasonable inferences in the light most favorable to the non-moving party. *See Krassner*, 496 F.3d at 237. Although factual allegations are therefore afforded a presumption of truth, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "To survive a motion to dismiss, the plaintiff's pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action" (internal footnote omitted))).

"In its review, the court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint

and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Grant v. County of Erie*, 542 F. App'x 21, 23 (2d Cir. 2013) (citations omitted). Thus, where, as here, a plaintiff attaches documents to a complaint, they "are deemed part of the pleading and may be considered" by the Court in ruling on a motion under Rule 12(b)(6). *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1998)). Furthermore, "the contents of the documents are controlling where a plaintiff has alleged that the document contains, or does not contain, certain statements," but "such documents may properly be considered only for 'what' they contain, 'not to prove the truth' of their contents." *Id.* at 511 (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *see also Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002); *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (citing *Sazerac Co., Inc. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994)). Thus, for example, where a plaintiff alleges that a general release he had signed was without consideration, but the release itself recited the consideration, the release controls. *Id.* (citing *Matusovsky*, 186 F. Supp. 2d at 400).

**B. TD Bank Never Assumed a Fiduciary Responsibility**

In essence, Plaintiffs allege that TD Bank was or should have been aware of the parties' Escrow Agreement and that through this actual or apparent knowledge TD Bank was under a fiduciary duty to safeguard Plaintiffs' interests in the escrow funds. Even assuming—and it is a generous assumption in light of the paltry non-conclusory facts alleged—that TD Bank was aware of the Escrow Agreement, such knowledge is not sufficient to establish a fiduciary relationship.

To state a claim for breach of fiduciary duty under New York law, "a plaintiff must demonstrate both a fiduciary relationship between the parties and a breach of the duty implied in

connection with such a relationship." *Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 26 (S.D.N.Y. 2009) (citing *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98 Civ. 6907, 2000 U.S. Dist. LEXIS 3941, at *31 (S.D.N.Y. Mar. 30, 2000)). Courts have held that "[a] fiduciary relationship may be found 'when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" *Thermal Imaging, Inc. v. Sandgrain Secs., Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) (quoting *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991)). Furthermore, "[t]he existence of a fiduciary relationship cannot be determined by recourse to rigid formulas. Rather, New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." *Id.* (internal citations and quotation marks omitted). But of critical relevance to the allegations here, "[m]ere reposal of one's trust or confidence in a party . . . does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well." *Id.*; *see also Musalli*, 261 F.R.D. at 26; *Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006).

Plaintiffs allege "[o]n information and belief [that] TD [B]ank and Cerwin Cox were on notice of the Deal Sheets and Escrow Agreement, and their terms, at the time of their execution, and were certainly so aware by the time of the first transfer of Plaintiffs' funds a few days later when Plaintiffs deposited the QUBE Funds into the Account. After learning of its existence, TD Bank never did anything to disavow its terms and the duties it ascribed to the Bank, and upon which Plaintiffs would for[e]seeably and reasonably rely." Am. Compl. ¶ 17. But Plaintiffs do not allege that TD Bank provided Plaintiffs with any indication that they accepted the fiduciary relationship that Plaintiffs were hoping the bank would undertake. In fact, Plaintiffs specifically

allege that "TD Bank . . . did *not* 'verify the authenticity of Conditions Precedent,' [or] take 'fiduciary responsibility for delivery of the [bank instrument]' via email or facsimile to [Qube Films and Matt Kelley Films]." Am. Compl. ¶ 33 (emphasis added). Thus, Plaintiffs' own Amended Complaint confirms that TD Bank never accepted any fiduciary obligation on Plaintiffs' behalf.

Even were the Court to credit Plaintiffs' many "naked assertion[s] devoid of 'further factual enhancement,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), mere notice that one has reposed trust or confidence in a party does not create a fiduciary relationship absent some acceptance of that trust or confidence. *Thermal Imaging*, 158 F. Supp. 2d at 343. The naked assertions in Plaintiff's Amended Complaint demonstrate why this rule exists; it would be an extraordinary expansion of tort liability for parties to contract among themselves to impose fiduciary obligations on a third party who never assumed such an obligation and, perhaps more importantly, never received anything in exchange for the risk associated with such an obligation.

Courts routinely reject such attempts to foist fiduciary responsibilities on unsuspecting third parties. For example, in *Thermal Imaging*, then-District Court Judge Chin addressed whether a brokerage's knowledge of the nature of the relationship between an accountholder and the accountholder's clients can give rise to an "implied fiduciary relationship." *Thermal Imaging*, 158 F. Supp. 2d at 342. Rejecting an argument akin to Plaintiffs' here, Judge Chin held that "[e]ven if [defendant] or its representatives did realize that the Pledged Shares were being held as collateral, this knowledge could not itself create a fiduciary duty on the part of defendants." 158 F. Supp. 2d at 342-344. Other courts addressing similar issues in the context of banks and their accountholders have reached the same conclusion. *See, e.g., Musalli*, 261 F.R.D. at 26 ("Therefore, although the Plaintiff alleges that it 'trusted and relied on Defendants

and their superior knowledge and expertise . . . no acceptance of this duty by the [Defendant bank] [was] alleged in the Complaint. Rather, it was [the accountholder] which served as Musalli's investment advisor and thereby accepted Musalli's trust and confidence."); *Regions Bank*, 423 F. Supp. 2d at 270 ("Although Regions may have reposed trust or confidence in W&M by transferring the money into the account, this does not give rise to a fiduciary duty because W&M never accepted a relationship of trust or confidence with respect to Regions."). Furthermore, the fact that Plaintiffs' funds were held in an "interest on lawyer account," or IOLA, does not change the result. In line with the cases above, the Second Circuit has held that "[i]n maintaining an IOLA account, the lawyer, not the bank, is charged with a fiduciary duty to the client. Indeed, the bank has no greater obligation under the [New York IOLA] statute than to follow the instructions of the legal signatory—the lawyer." *Peoples Westchester Savings Bank v. FDIC*, 961 F.2d 327, 332 (2d Cir. 1992).

Putting aside the numerous contradictions between Plaintiffs' allegations and the documentary support they supplied with their Amended Complaint, the Court holds that their allegations fail to state a claim for breach of fiduciary duty under New York law. At best, Plaintiffs have asserted that TD Bank may have known about the Escrow Agreement and that Plaintiffs unreasonably relied on TD Bank to perform certain fiduciary duties, but Plaintiffs do not allege that TD Bank ever assumed the fiduciary duty that they hoped the bank would undertake.

**C. TD Bank Did Not Owe a Duty to Plaintiffs**

Plaintiffs next assert claims that TD Bank committed negligence and gross negligence by releasing the funds in the Escrow Account at Padell's direction. To state a claim for "negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" *Lerner v. Fleet*

*Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (quoting *Solomon ex rel. Solomon v. City of New York*, 489 N.E.2d 1294, 1294 (N.Y. 1985)). Whether a defendant owes a duty of care to a plaintiff "is a question of law that the Court may properly determine on a motion to dismiss." *Musalli*, 261 F.R.D. at 27 (citing *Purdy v. Pub. Adm'r of Westchester*, 526 N.E.2d 4, 6-7 (N.Y. 1988)). Of particular relevance here, "[b]anks generally do not owe non-customers a duty to protect them from fraud perpetrated by customers." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 431 F. App'x 17, 20 (2d Cir. 2011) (citing *In re Terrorist Attacks on Sept. 11, 2011*, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005), *aff'd* 538 F.3d 71 (2d Cir. 2008)).

Plaintiff alleges that "[b]y directing and transferring the QUBE Funds other than to New Co. or back to Plaintiffs, PADELL and TD Bank wrongfully, and carelessly caused Plaintiffs to suffer the loss of the $900,000 . . . . Given the obvious lack of liquidity in the instrument that purported to represent the ARK Funding, PADELL and TD Bank's release of the QUBE Funds falls somewhere on the spectrum from mismanagement to fraud." Am. Compl. ¶ 27. But the very next allegation states that "Defendant PADELL, acting in his capacity, had the authority to release the funds – if and when the other conditions precedent of the Escrow Agreement were met – to an account created in favor of New Co. PADELL instead released the funds . . . to ARK and NGE in violation of his duties as well as the essential terms of the Financing and Escrow Agreements." Am. Compl. ¶ 28. Thus, TD Bank released the funds at Padell's direction.

Plaintiffs hired Padell, not TD Bank, as their escrow agent. "An escrow agent owes the parties to the transaction a fiduciary duty, and therefore the agent, as a fiduciary, has a strict obligation to protect the rights of [the] parties for whom he or she acts as escrowee." *Greenapple v. Capital One, N.A.*, 939 N.Y.S.2d 351, 352-53 (App. Div. 2012) (citations and

internal quotation marks omitted). As such, Padell "ha[d] a duty not to deliver the monies in escrow except upon strict compliance with the conditions imposed by the controlling agreement. *Id.* (citing *Farago v. Burke*, 186 N.E. 683, 684-85 (N.Y. 1933)). Thus, while Padell had a duty to maintain Plaintiffs' property pursuant to their instructions, the fact that Padell maintained that property at TD Bank does not create a duty on the part of TD Bank to Plaintiffs.

Addressing circumstances analogous to those presented here, the Second Circuit held that "[i]t is well settled that 'a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation.'" *2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corp.*, 503 F. App'x 51, 54 (2d Cir. 2012) (quoting *Lerner*, 459 F.3d at 287). In *Signature Bank*, plaintiffs alleged that the defendant bank was liable for the misappropriation of their trust funds held by a former trustee at the defendant bank. The Second Circuit held that "[t]he bank has the right to presume that the fiduciary will apply the funds to their proper purposes under the trust," and so "[i]t was up to the Trustees, not Signature Bank, to make sure that Trust funds were being used appropriately." *Id.* (citing *Lerner*, 459 F.3d at 287); *see also Musalli*, 26 F.R.D. at 42-44 (holding that defendant bank did not owe a duty of care to the defrauded victim of one of its customers who held the victim's property at defendant bank); *Tzaras v. Evergreen Int'l Spot Trading, Inc.*, No. 01 Civ. 10726 (LAP), 2003 U.S. Dist. LEXIS 2707, at *19 (S.D.N.Y. Feb. 26, 2003) (same); *Renner v. Chase Manhattan Bank*, No. 09 Civ. 926 (CSH), 1999 U.S. Dist. LEXIS 978, at *39-40 (S.D.N.Y. Feb. 3, 1999) (same). To hold otherwise and find that "banks owe a duty to their depositors' creditors to monitor the depositors' financial activities . . . would be to unreasonably expand banks' orbit of duty." *Century Bus. Credit Corp. v. North Fork Bank*, 668 N.Y.S.2d 18, 19 (App. Div. 1998). Plaintiffs were not customers of TD Bank, they had no contractual

relationship with TD Bank, and, as noted above, they did not even allege any direct contact with TD Bank. Because Plaintiffs have failed to allege that TD Bank owed them a duty of care, their claims for both negligence and gross negligence fail to state a claim upon which relief can be granted. On the facts here, Plaintiffs' recourse, if any, is from their escrow agent, not his bank.

### D. Plaintiffs Failed to State a Claim for Tortious Interference

In Plaintiffs' sixth cause of action for tortious interference with a contract, they allege that by releasing the escrowed funds to ARK and NGE, TD Bank caused a breach of the escrow agreement and resultant pecuniary harm in the amount of $900,000. Am. Comp. ¶ 60. To state a claim for tortious interference with a contract under New York law, "the plaintiff must show [1] the existence of its valid contract with a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional and improper procuring of [4] a breach, and [5] damages." *Savage v. Galaxy Media & Mktg. Corp.*, No. 11 Civ. 6791 (NRB), 2012 U.S. Dist. LEXIS 93944, at *28-29 (S.D.N.Y. July 5, 2012) (quoting *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007)). Plaintiff must also show that the "breach of the contract would not have occurred 'but for' the defendant's conduct." *Id.* at *29 (citations omitted); *see also Balance Point Divorce Funding, LLC v. Scrantom*, No. 13 Civ. 1049 (PKC), 2013 U.S. Dist. LEXIS 152334, at *14-15 (S.D.N.Y. Oct. 21, 2013).

Plaintiffs' Amended Complaint alleges the existence of a valid escrow agreement, Am. Comp. ¶ 13, Ex. 2, and damages, Am. Compl. ¶ 46. Putting aside the issue of whether Padell breached the Escrow Agreement, which is not before the Court at this time, Plaintiffs fail to allege that TD Bank knew of the Escrow Agreement or intentionally and improperly procured a breach of it. Plaintiffs allege, "on information and belief, TD Bank and Cerwin Cox were aware that he and TD Bank were so designated [as Funding Bank Institution] in the Escrow Agreement." Am. Compl. ¶ 17. Plaintiffs also allege that "on March 14, 2011 Escrow

Instructions (Exh. 4) were addressed to . . . TD Bank's Wall Street Branch," Am. Comp. ¶ 23, but these instructions were only addressed to Bert Padell, not TD Bank, which was merely listed without an address below Padell's address. Ex. 4 at 1. Plaintiffs never allege that they actually sent the Escrow Instructions to TD Bank or that TD Bank in some other way received the Escrow Instructions. Plaintiffs state in their opposition to the motion to dismiss that "once [TD Bank] had received the March 15 Instruction [Ex. 5] it was incumbent on it to look into the agreements [that the March 15 Instructions] referenced." Opp. at 4. But, again, these instructions were only directed to Grier, Richmond, and Padell, not TD Bank, Ex. 5, and Plaintiffs do not allege that TD Bank was ever sent or received the instructions. Moreover, this document clearly stated that it was "in reference to [a] funding agreement between Ark Capital Ventures, Napoleon Enterprises, Inc. and Qube Films." So even if TD Bank had received the instructions, nothing in the instructions would alert TD Bank to the bank's possible involvement in the transactions and prompt it to inquire further. Ex. 4 at 1.

The most generous reading of these allegations is that TD Bank had constructive knowledge of the Escrow Agreement, which Plaintiffs allege was breached with the release of funds to entities other than New Co. But constructive knowledge is not enough; Plaintiffs must allege actual knowledge. *LinkCo., Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 496 (S.D.N.Y. 2002) ("Assuming, arguendo, that Fujitsu had knowledge of this implicit obligation, which is highly unlikely, it did not have actual knowledge of the contracts at issue, as required by law."). Thus, contending that it was incumbent upon TD Bank to seek out an agreement that it may not have known existed is not enough to state a claim for tortious interference under New York law. *Ferring B.V. v. Allergan, Inc.*, 12 Civ. 2650, 2014 U.S. Dist. LEXIS 33057, at *28-29 (S.D.N.Y. Mar. 13, 2014) (citing *A A Tube Testing Co. v. Sohne*, 246 N.Y.S.2d 247, 248 (App. Div. 1964)

("As an essential element of the cause of action sought to be pleaded the plaintiff must allege that the defendants had *actual* knowledge; an allegation that they 'should have known' of the existence of the contract is insufficient.")); *see also Business Lenders, LLC v. PKR Stores, LLC*, No. 005566/2010, 2010 N.Y. Misc. LEXIS 4923, at *16 (Sup. Ct. Oct. 7, 2010) (agreeing that "allegations of constructive knowledge, or a duty to inquire, are inadequate to constitute an enforceable claim" for tortious interference under New York law).

Assuming, for the sake of argument, that Plaintiffs were able to allege actual knowledge, their claim would still fail because Plaintiffs do not plead that TD Bank intended to tortiously interfere with the Escrow Agreement. To plead the intent element, Plaintiffs must "allege that Defendant took . . . actions toward third parties with which Plaintiff had contracts." *Plasticware v. Flint Hills Res.*, 852 F. Supp. 2d 398, 404-05 (S.D.N.Y. 2012) (collecting cases). Thus, Plaintiffs must allege that TD Bank took actions toward Padell that would have caused him to breach his contract with the Plaintiffs. Instead, Plaintiffs allege that TD Bank released the funds at Padell's direction. They do not allege that TD Bank directed Padell to breach the Escrow Agreement.

Therefore, because Plaintiffs failed to adequately plead actual knowledge of the Escrow Agreement and intentional interference with Plaintiffs' contractual relations with Padell, they have failed to state a claim upon which relief can be granted.

## III. CONCLUSION

For the reasons stated herein, Plaintiffs have failed to state any claims upon which relief can be granted against TD Bank. Plaintiffs' claims against TD Bank are hereby dismissed with prejudice. There being no other claims pending against TD Bank, it is dismissed as a party to this action. This Opinion and Order resolves Dkt. No. 15.

SO ORDERED.

Dated: ~~July~~ Aug 12, 2014
New York, New York

ALISON J. NATHAN
United States District Judge