UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| QUBE FILMS LTD., NAVID SOOFI, and MATT KELLEY FILMS, LTD., <br><br>    Plaintiffs,<br><br>vs.<br><br>BERT PADELL, PADELL AND COMPANY,<br><br>    Defendants. | )<br>)<br>)<br>) Case No.: 1:13-cv-08405-AJN<br>)<br>) **PLAINTIFFS' MEMORANDUM**<br>) **IN OPPOSITION TO**<br>) **DEFENDANT'S MOTION FOR**<br>) **SUMMARY JUDGEMENT**<br>)<br>)<br>) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR
SUMMARY JUDGEMENT**

Plaintiffs file this Memorandum, the accompanying Rule 61 Plaintiffs' Counter-Statement of Facts ("PCFS") and the Declaration of Michael Strage with attached exhibits, in Opposition to Defendant Padell's Motion for Summary Judgment.

# TABLE OF CONTENTS

I   INTRODUCTION                                                                      1.

II  COUNTER STATEMENT OF FACTS                                        2.

III ARGUMENT                                                                           10.

    A. The Legal Standard                                                         10.

    B. The Evidence Supports a Finding that Defendant Padell owed Plaintiffs

       Contractual and Fiduciary Duties to Plaintiffs as Escrow Agent.         11.

    C. The Evidence Supports a Finding that Defendant Padell Breached his

       Contractual and Fiduciary Duties to Plaintiff as Escrow Agent.          12,

    D. The Evidence Supports a Finding that Defendant Padell's Acts and

       Omissions were Negligent, Grossly Negligent or Worse.                   14.

    E. The Evidence Supports a Finding that Defendant Padell's Negligent Acts

       Caused Plaintiffs' Damages.                                                  15.

IV CONLUSION.                                                                          16.

I

INTRODUCTION

Defendants motion for Summary Judgment rests on an incomplete and inaccurate factual recitation, a self serving and selective reading of the contracts at issue, and a complete disregard of the law governing the relationship between him and the Plaintiffs whose money he held in trust then distributed to himself and his friends. The evidentiary omissions in the Defendant's moving papers reveal the very factual disputes that undermine its legal foundation. Key contractual provisions omitted, communication mis-cited, obligations ignored, and the unmentioned and utterly untoward and incriminating trail of money that Defendant personally structured and directed his own way, are all well documented, and create, at a minimum, the type of factual contest that precludes summary judgment.  On this record, a fact finder will have to determine if the Defendant breached his contractual and legal obligations as the escrow agent who disbursed almost a million dollars to himself and others in violation of those obligations.

II

COUNTER STATEMENT OF FACTS

Plaintiffs' Rule 56 Statement (PCFS) filed herewith sets forth, in detail, Plaintiffs response to Defendant's version of the facts. Among the most important omissions from that narrative are the following undisputed facts, applicable contractual obligations, and specific instructions that all undermine moving Defendant's position and the evidentiary basis of his motion.

No better documented factual evidence of what occurred in this case can be found than TD Bank's records and its officer Cerwin Cox's narrative of money trail that Defendant's motion entirely ignores. (PCFS ¶ 42, 23,58,59, 71 and 77 and Exs 28-42 to the Cox Deposition attached as Exhibit B to the accompanying Declaration of Michael Strage, and Ex H and I thereto). Any reasonable finder of fact will free to draw the logical inferences as well as the reasonable legal conclusion from the fact that Defendant Padell took control of Plaintiffs' money on the simple condition that he hold it or distribute it to a film production company once other funding had been raised, and instead took it and shared it with his associates. The evidentiary trail is thoroughly and completely documented. with the account opening forms he personally completed for the IOLA account as well for the business account he that he intentionally deceptively and incorrectly designated as an escrow account (PCFS ¶ 71.4 account and Ex 8-9 to Cox Depo), he also created for his and his associate Napolean Grier's (See PCFS ¶42) business NG Enterprises, and into which he would improperly divert the largest part of Plaintiffs' money. (See (PCFS ¶ 42, 23,58,59, 71 and 77 and Ex 28-42 of the Cox Deposition at p. 63-80 attached as Exhibit B to the accompanying Declaration of Michael Strage and Exhibits H and I therto )  The trail of Plaintiffs money coming in to Padell's brand new IOLA account, and the specific transfers to himself his company's also brand new account, and to others, none of which were making Plaintiffs' film, are itemized in the TD bank records. The transaction paperwork Mr. Cox and the bank required Defendant to Padell to complete manually or by telephonic interaction demonstrate how Padell diverted Plaintiffs' funds systematically and improperly. (PCFS ¶ 42, 23,58,59, 71 and 77 and Ex 28-42 to Cox Depo Ex. B to Strage Decl. and Ex H and I hereto).

Notwithstanding these dozens of documents that he completed, and the detailed testimony of the bank officer Cox with whom he met and spoke repeatedly (Cox Depo. passim), Padell purports to have no recollection of almost any of this. ( Padell Deposition Ex A to Strage Decl. passim). He further claims, through proffered expert testimony, that is the subject of Plaintiff's Daubert Motion Doc on file in this action., that if he did execute any or all of these transactions, at the time he lacked the capacity to understand what he was doing. Though he could not remember he offered the explanation that if he did those things he was the dupe of one of his partners. (PCFS ¶ 27 and Padell Depo pp 68-69, ) The dubious nature of both of these claims is brought into further doubt by the fact that at the same time he was conducting an almost identical scheme in Illinois, evidence that goes directly to his claims of incapacity, as well as his knowledge and intent in this case. (See Ex E to Strage Decl, the Padell Illinois Deposition previously filed with this Court as an Exhibit to Doc Plaintiffs' Opposition to Defendant's Motion for a Protective Order). In that case as evidenced in that deposition, within months of the events in this case he opened escrow accounts, accepted money subject to subsequent funding that never materialized, and diverted those funds personally, to the same cast of characters. (See the Complaint in the Illinois action Ex 5 to Padell Depo. Ex A to Strage Decl, and Ex I to Strage Decl. ) Before conceding liability in a Confession of Judgment (see Ex 4 to Padell Deposition and separately H to Strage Decl.). Defendant Padell made many of the same attempts to avoid responsibility, but the Illinois Federal Court rebuffed him denying his motion. (See Plaintiffs' Opposition to Defendant's Motion for a Protective Order on file in this case, and attached Order of the Illinois Court).

Whether he knew what he was doing at the time, or whether or not he remembers today or not, Defendant Padell played the pivotal role in the improper

5

movement of Plaintiffs' funds as reflected in all of the banking records. (See PCFS ¶ 41, 42, 23,58,59, 71 and 77 and Ex H and I to the Strage Decl ) Based on his reputation Plaintiffs entrusted Padell with almost a million dollars, his role as escrow agent the *sine qua non* of their involvement with Padell's associate Napoleon Grier. (PCFS ¶ 17-19 and ¶ 26,31,38,53 and 68 )  And when things began to go awry, and the Plaintiff's began to have doubts, they sent him an explicit instruction on March 16, 2011 not to move any money at all al (PCFS ¶ 71, 71.14, and 73   and Ex  G to Strage  Decl.) Instead, he moved the balance of Plaintiffs' funds out of his IOLA account to himself ($195,000 in total See (PCFS ¶ 71.19,) and others. (PCFS ¶ 71  ) And he also moved then money from the business account he had just created, further down the trail to other accounts controlled by himself Grier and his cronies, with none of it arriving anywhere near the film production company, or New Co, Plaintiffs' funds' only legitimate or permissible destinations. (PCFS ¶ 71).

As his story fails to include these key facts regarding his execution of every step of the financial transaction and the salient facts including the March 16, 2011 order he disobeyed,  likewise Defendant's motion rests on a contractual interpretation that omits these specific and controlling provisions (PCFS ¶¶  27,28,35,30, 36, 42,44,45,46,47,48,49,50,56,63,67.68,69,70.71, and the Escrow Agreement (Ex I  to Doc the Anesh Declaration, the "Escrow Agreement")):

1. Under the express terms of the Escrow Agreement two conditions had to be met prior to the release of any funds: first, funds were to be released if Padell received notice that the condition precedent had been met with the arrival of a banking instrument convertible into liquid funds: see §5(a)(i)(ii)(iii); and second, funds had

to be released only to Salesmen LLC (or NewCo, the Entity that was to be formed to produce the film): see §5(b)(ii). The idea was that the Plaintiffs' funds were to be released only upon the arrival of the rest of the money needed to make the film, all of which would be transferred to NewCo to make the movie. The arrival of the rest of the money in liquid form had to occur before Defendant was to send their money to it only proper destination, the company that would produce the film (See PSCF ¶¶63 and 71).

2. Under the terms of the Amended Deal Sheet (Ex J to Anesh Decl., the "Amended Deal Sheet" ), that Defendant also signed, funders "will arranged a Bank Instrument for $6 Million" and Plaintiffs were to authorize release of only $500'000 for bank expenses only "in exchange of" BI Pre-Advice in favor of Salesmen LLC. The Amended Deal Sheet does not authorize Padell to rerelease funds to "Financiers", or to himself. Furthermore, the Amended Deal Sheet states that conditions precedent and release to Salesmen as per the Escrow Agreement are not waived or altered by this agreement.

3. The March 14, 2011 Escrow Instructions (Ex K to Anesh Decl., the "The March 14, 2011 Escrow Instructions" ), containing new conditions were addressed to him and explicitly stating that the "purpose of Escrow Agreement is to guarantee" that "all provisions of the funding agreement are satisfactorily performed by the Financiers". These March 14, 2011, Escrow Instructions state, "The funds shall be used to secure ... Bank Instrument ... provided its immediately convertible into liquid currency," and upon acceptance of a Pre-advice that liquid funds were on

deposit, Plaintiffs consented to the release , "to the Funders….. in exchange of Prime World Money Center Bank Instrument and contingent funding ... " The March 14, 2011 Escrow Instructions containing were addressed to Defendant and are relevant to the agreed upon proviso that: "purpose of Escrow Agreement is to guarantee" that "all provisions of the funding agreement are satisfactorily performed by the Financiers".

4. The March 15, 2011 Instructions (Ex L to Anesh Decl., the "The March 15, 2011 Escrow Instructions" ) state that: "escrow to be released in full, to be used in creation of the banking instrument and initiate funding for and in the full benefit of Qube Films, Matt Kelly Films and the motion picture, Salesmen ". This does not confirm that condition precedent had been met, but does preclude Defendant's diversion of funds to himself rather than the film production company. These March 15 Instructions also repeats that all funds must be released in accordance with and to the full benefit of the Film.

Thus the Amended Deal Sheet and Escrow Instructions allowed (partial) release of the funds by Padell, but always only subject to conditions being met (i.e. liquid funds being on deposit, "provided that" any such release be only, "for the full benefit of Salesmen" ). (PCFS ¶¶ 27,28,35,30, 36, 42,44,45,46,47,48,49,50,56,63,67.68,69,70.71, The Escrow Agreement and Deal Sheet and Amended Deal Sheet provide for payment only to NewCo or Salesmen LLC. Therefore, when Padell received the March 14 and 15 Escrow Instructions to release funds, it was always subject to conditions and funds had to go to New Co under the Escrow Agreement. Thus Padell was obligated to ensure that conditions for release as set in the Escrow Agreement and Instructions were fulfilled,

including the condition precedent that the balance of $3,000,000 needed for the film had arrived in liquid form, and that any distribution of funds be made to the film production company and nowhere else.   (PCFS ¶¶  27,28,35,30, 36, 42,44,45,46,47,48,49,50,56, 63,67 .68,69,70.71).

  These contractual provisions and the legal relationship they create include the duties and obligations that Defendant breached when he released Plaintiffs' Funds to himself and his associates instead of to the only permitted and specifically designated destination, the film company that was to produce the film. Defendant's motion ignores utterly all of these explicit obligations and instructions, focusing instead on a single subsection of the Escrow Agreement read out of context. Notwithstanding this, the Notably Defendant does acknowledge that he remained, at all times, liable for gross negligence under the specific terms of the  Escrow Agreement.(Defendant's Memo of Law in Support of his Summary Judgment Motion, Doc    at p.14-15)

  Likewise, the more complete and unedited communications referenced by Plaintiffs (PCFS ¶¶ 71 and 73 and Ex H to Strage Decl.). tell a very different story than the partial version Defendants would cobble together with spider webs and sealing wax in the form of ignored emails and telephone calls evidenced in the record and deceptively omitted language from precise written instructions. Padell's refusal to respond to repeated inquiries after he moved the money other than as required to the film company, and instead to himself, and a company for whom he had just opened an account, as documented thoroughly with records from TD Bank are uncontroverted. (PCFS ¶¶ 71-77) And, on March 16, 2011 emphatically, Kelly emailed Padell that under no circumstances

should any funds beyond the first $510,000.00 be released (PCFS ¶ 71.1 , and Ex G to Strage Decl.) Defendant Padell ignored that admonition, as does his motion, and instead he transferred the balance of Plaintiff's funds to himself in direct contravention to that order.

### III

### ARGUMENT

A. The Legal Standard

To resist a motion for summary judgment in this jurisdiction under Federal Rule of Civil Procedure 56 (C), the law is well settled that a party need demonstrate that given the record, there is something legally relevant for a fact finder to decide about the claims in question. Mechanically speaking the moving party has the burden of establishing that the evidence adduced can only fairly be interpreted to defeat one or more of the elements of the prima *facie case* of a given cause of action. If that showing falls short of its own weight, or if it is contested with evidence putting those factual elements back into issue, the motion fails. Here it should for both of those reasons. As there are disputes related to the facts relevant to the outcome of this suit under the governing law, summary judgment is inappropriate. Matsushita Elec. Indus Corp v. Zenith Radio Corp. 475 U.S. 574, 586 (1986) The Second Circuit summarized the summary judgment rules in Gallo v. Prudential Residential Services, Ltd.,22 F.3d 1219, 1222 (2d Cir. 1994) ("Considering how often we must reverse a grant of summary judgment, the rules for when this provisional remedy may be used apparently need to be repeated."):

First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. Id. (internal citations omitted).

Fairly retold and read the evidence that Defendant proffers, the Escrow Agreement and the related narrative form the basis of much of Plaintiffs' Opposition. To cite his argument, and to consider the evidence that he offers in context and without selective editing, is to rebut his position in large measure. And the evidence it mis-cites and omits defeat his motion completely as set forth in the accompanying Statement Plaintiffs' Contested Statement of Facts. At a minimum, it establishes the existence of a trial-able issue as to each legally relevant factual element in this case: did Defendant Padell owe a legal or contractual duty to Plaintiff, add his actions and omissions constitute a breach of those duties and did that breach cause the loss of Plaintiff's money. And finally, was that breach grossly negligent, recklessly negligent or worse?

Because of the related nature of the causes of action and the overlapping relevance of the key documents and testimony in the evidentiary record we organize this Argument around the relevant factual issues and their evidentiary support. In sum, far from the limited legal and transactional role Defendant ascribes to himself, the evidence supports his having performed actively a pivotal role as the escrow agent, engaging in

dozens of transactions in a matter of days, while undertaking a key legal and contractual role as fiduciary controlling every dollar's movement, from and to accounts which he owned or controlled. Under a fair reading of the evidence, one can conclude that Defendant's acts and omissions breached his obligations and led to Plaintiff's loss.

> B. The Evidence Supports a Finding that Defendant Padell Owed Contractual and Fiduciary Duties to Plaintiff as Escrow Agent.

Defendant Padell's acts and omissions violated both his contractual duties as Escrow Agent and his fiduciary duty. Regardless on the limits Defendant would place on his obligations, they are manifest under the Escrow Agreement and related writings. Defendant concedes he owed contractual duties and acted as the escrow agent, for the deal using his own attorney IOLA account. The dispute is over the scope not the existence or nature of the relationship between the parties. Specifically, a jury will have to decide whether Padell, in his capacity as escrow agent, pursuant to the Escrow Agreement had the contractual duty to verify that the conditions set in the March 14 and 15, 2011 Escrow Instructions were met, prior to releasing the funds; and if so, whether he was authorized to direct the funds as he did; and, if after Kelley expressly told him not to release any funds beyond $510,000, he had a duty as fiduciary and escrow agent, to follow those specific instructions. These are precisely the type of questions finders are supposed to consider provided they are legally relevant and contested as they are here.

.

C. The Evidence Supports a Finding that Defendant Padell Breached his

Contractual and Fiduciary Duties to Plaintiffs as Escrow Agent.

Under the specific terms and the essential purpose of his role, Defendant Padell's obligation was to secure Plaintiffs' funds and transfer them to NewCo the film production company, once the rest of the money had been raised, nothing else. The escrow agent Defendant's failure to do either violated both the specific contractual obligations set forth above and as well as the most basic aspect of his fiduciary duty as escrow agent. Specifically, a fact-finder could fairly determine that his release of the funds violated the specific provisions of the Escrow Agreement requiring the satisfaction of the conditions precedent that were never met. And, his disobeying the specific directions in the Amended Deal Sheet, the March 14 and 15, 2011 Instructions, and finally in the March 16, 2011 email directing that no further funds (beyond the initial $510,000,) be released, offer ample evidence for a finder of fact to conclude that he was under obligations that he breached.

Beyond these specific contractual provisions, and explicit instructions, in his capacity as fiduciary, under the most basic precept of applicable New York law, Defendant Padell owed a duty to place Plaintiffs' interest ahead of his own. Manifestly, by diverting the funds to himself in the unpermitted manner he did (PCFS ¶ 71.19), Defendant Padell could not have violated that obligation more completely.

In order to prove breach of a fiduciary duty in New York, plaintiff must demonstrate that a fiduciary duty existed between plaintiff and defendant. <u>Thermal Imaging, Inc. v. Sandgrain Sec., Inc.</u>, 158 F.Supp.2d 335, 343 (S.D.N.Y. 2001). "The

13

existence of a fiduciary relationship cannot be determined `by recourse to rigid formulas.'" *Id.* at 343 That court considered the facts and circumstances and found them lacking as the defendant was unaware of the source of the lost funds, and was also not aware of any agreements controlling them. While the factual scaffold on which Defendant's motion rests holds no weight, the case it relies on are likewise not compelling. In H &H Acquisition Corp v. Fin. Intranet Hodings Corp. 669 F. Supp 2d 351, 363 (2009 S.D.N.Y.) the movants were only partially successful with an unopposed motion on completely distinguishable facts. There the complaint was that funds were held and  not released, the escrow agent determining to hold them while awaiting direction from a court of law. Would that Defendant Padell had taken his fiduciary duty and contractual role as escrow agent  as professionally, and performed them as dutifully and selflessly..  The other case cited involve attorney fighting over a fee Ray Legal Consulting Group v. DiJoseph 37 F. Supp. 3d 704(2014 S.D.N.Y.).  Neither case is instructive on the law or the facts, especially the undisputed and essential facts that Defendants motion ignores that distinguish his own conduct completely from the precedential authorities upon which he would rely.

  D. The Evidence Supports a Finding that Defendant Padell's Acts and Omissions were Negligent Grossly Negligent or Worse.

   The seminal principle at issue in this case is that a claim for negligence under settled New York law requires the allegation of a duty whose breach harmed the claimant. The most noted articulation of this standard states that the basic element of a negligence claim is the existence of a duty owed to plaintiffs by defendants. *See generally* Palsgraf v. Long Island R.R. Co.*,* 248 N.Y. 339, 162 N.E. 99 (1928).   Given Mr. Padell's claims of

present and past mental incapacity and lack of recollection of the salient events and documents including his own actions (See Padell Depo and Padell Ill. Depo passim, and the Daubert and Protective Order Motions on file on this case.), Plaintiffs are hard pressed to directly establish the degree of the element of the negligence of Defendants actions, or and establish directly the intent necessary to prove fraud. Beyond what his actions say for themselves, from the transparency and venality of his very claim not to have been aware of what he was doing, or to be able to remember what he did, a trier-of-fact could fairly infer, along with his utterly contradictory detailed and informed actions effectuating the movement of Plaintiffs money to him and his partner -that Defendant Padell knew exactly what he was doing, It is not unreasonable for someone to conclude from this record that Padell's story and defenses just do not pass the smell test, especially considering the contemporaneous and parallel scheme he has conceded he was involved with in Illinois with the same associates. While Padell's claims of mental handicap are dubious, at a minimum they constitutes a complete admission that he was operating with gross negligence at the time and apparently since: taking on clients, opening accounts, moving money all without any recollection or apparent knowledge of what he was doing, or as the dupe of his partners If not utterly reckless, it was grossly negligent for him to conduct business in this fashion, as he continues to do to this day. (See Daubert Motion papers on file in this action) A fact-finder not believing Defendant's convenient claims of mental incapacity would likely conclude that his behavior was, at a minimum, negligent if not more sinister and intentional. Either way, the results speak for themselves, but for Padell's failure to follow instructions and obligations, Plaintiffs' money would not have been lost. However should the trier of fact determine, as it fairly could, that these actions, violative as they are of his heightened fiduciary duty, were in

fact grossly negligent, as Defendant concedes in its moving papers (Defendant's Motion for Summary Judgment at p.14-15) they are not even arguably subject to the protection under the Escrow Agreement.

E. The Evidence Supports a Finding that Defendant Padell's Negligent Acts Caused Plaintiffs' Damages.

As the money trail establishes none of the funds Defendant handled, transferred in and out of accounts, except $50,000 ever got to back to Plaintiffs. (PCFS ¶¶ 42, 23,58,59, 71 and 77)  Plaintiffs are still out $850.000. They failure of the project also caused the loss of the opportunity and what Plaintiffs fairly expected to get from it but for Defendant's breaches. ((PCFS ¶ 4-81; Soofi Depo at p.143-144  Ex D to Strage Decl., and  Kelley Depo . at p. 260-268   Ex C to Strage Decl.).

## IV CONLUSION

Consideration of the material uncontroverted evidence in the record, that fully informs the factual elements of the causes of action that Plaintiffs assert , compels denial of Defendant's Motion for Summary Judgment under the controlling legal standard.  While Defendant's highly selective, creative, and self-serving version of the facts may be an admissible trial presentation, it cannot support this motion that seeks to preclude Plaintiffs from making their own presentation with its full factual foundation supporting each legal element with admissible and credible evidence as to how and why their fiduciary and escrow agent  is liable for his personal mishandling of their funds.

16

For the foregoing reasons, Defendants' motion for summary judgment should be denied, and the case set for trial.

Respectfully submitted,

Dated: April 18, 2015

BY: Michael M Strage (MS 6674)

MICHAEL STRAGE
730 Fifth Ave Suite 1901
New York N.Y. 10019
(646) 642 0701
michaelstrageesq@gmail.com

Homayoon Arfazadeh
Python & Peter
2 Rue Charles Bonnet,
1206 Geneve,
Switzerland
+41 78 732 20 77
harfazadeh@pplex.ch

TO: VIA ECF, and EMAIL

Mr. Mark Anesh Esq.

and Anthony Proscia Esq. Attorneys for Defendants