UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Qube Films Ltd *et al.*,

                Plaintiffs,

–v–

Bert Padell *et al.*,

                Defendants

13-CV-8405 (AJN)

MEMORANDUM AND ORDER

ALISON J. NATHAN, District Judge:

On February 13, 2014, Qube Films Ltd, Navid Soofi, and Matt Kelly Films Ltd ("Plaintiffs") filed an Amended Complaint against Bert Padell and Padell and Co. ("Defendants") alleging that Defendant Padell violated his contractual and fiduciary duties under an escrow agreement. *See* Dkt. No. 13. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. *See* Dkt. No. 64. For the reasons articulated below, this motion is granted in part and denied in part.

**I.    LEGAL STANDARD**

In evaluating a motion for summary judgment, the Court must "constru[e] all evidence in the light most favorable to the non-moving party." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 173 (2d Cir. 2006). Granting such a motion is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is not "genuine" if no reasonable jury "could return a verdict for the nonmoving party." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). However, this burden "may be discharged by . . . pointing out. . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once this burden is met, "the opposing party must come forward with specific evidence demonstrating . . . a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "If a party fails . . . to properly address another party's assertion of fact . . ., the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2). Ultimately, to defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011) (citing *Anderson*, 477 U.S. at 256–57).

## II. BACKGROUND[1]

Plaintiff Qube Films, Ltd ("Qube Films") is a film production company whose President is Plaintiff Navid Soofi. *See* PCS ¶ 1, 10-13; Dkt. No. 65 Ex. H at 2. In 2011, Qube Films entered into an agreement with another film company, Plaintiff Matt Kelly Films Ltd ("Kelly Films"), whose President is non-party Matt Kelly, to provide financing for the movie "Salesman." *Id.* ¶ 1, 15. To further this deal, Qube Films and Kelly Films contracted with Napoleon Grier Enterprises ("Grier Enterprises") and Ark Capital Ventures ("Ark Capital") to secure financing for the movie. *Id.* ¶ 17.

On March 8, 2011, Qube Films, Kelly Films, Grier Enterprises, and Ark Capital executed a financing agreement. *Id.* ¶ 30; Dkt. No. 65 Ex. H ("Deal Sheet" or "DS"). This financing

---

[1] Unless otherwise noted, the following facts are not in dispute and are taken either from the Plaintiff's Counter-Statement of Material Facts, Dkt. No. 77 ("PCS"), or the relevant underlying documents.

agreement provided that Grier Enterprises and Ark Capital would provide $4.8 million in financing, while Qube Films and Kelly Films would provide $1.2 million, to "NewCo" to produce the movie. DS ¶ 1. These funds would be deposited into an Escrow Account managed by Escrow Agent Bert Padell. *Id.* ¶ 2. The Deal Sheet further provided that "the escrowed funds w[ould] be released to the NewCo in accordance with the Escrow Agreement." *Id.* ¶ 5. Padell was not a signatory to the March 8, 2011 Deal Sheet. *Id.* at 2.

Also on March 8, 2011, Qube Films, Kelly Films, Ark Capital, and Padell entered into an Escrow Agreement. *See* Dkt. No. 65 Ex. I ("Escrow Agreement"). That agreement designated Padell as the "Escrow Agent" of a TD Bank Escrow Account ("Escrow Account"), for which Qube Films and Kelly Films were "Depositors" and Ark Capital the "Service Provider." *Id.* §§ 1-2. Under the terms of the Escrow Agreement, Padell was obligated to "hold the Escrow Property in [his] possession and disburse the Escrow Property subject to the Depositor instructing Escrow Agent that [certain] 'Conditions Precedent' are satisfied (the 'Depositor's Instruction')." *Id.* § 5(a). Upon receiving the "Depositor's Instruction," Padell was "authorized and directed to withdraw [funds] from the Escrow Account." *Id.* § 5(b). Those funds were to be paid to the "Depositor's Designated Account", defined as "banking coordinates . . . provided within 5 business days of Conditions Precedent being satisfied." *Id.* § 5(b)(ii). Padell was also "authorized to deduct [$10,000]" from the Escrow Account as compensation for his services as Escrow Agent. *Id.* § 6.

The Escrow Agreement contained several limitations on Padell's obligations as Escrow Agent. First, Padell had no "responsibility to determine the authenticity or validity of any notice, direction, instruction, instrument, document or other items delivered to it by any party." *Id.* § 9(d). Additionally, he would "incur no liability . . . for having acted in accordance with

instructions on which [he was] authorized to rely." *Id.* § 5(d). Finally, any potential liability was limited to "gross negligence or willful misconduct" and excluded "any consequential, punitive or special damages." *Id.* § 9(h).

On March 11, 2011, Qube Films, Kelly Films, Grier Enterprises, Ark Capital, and Padell entered into another financing agreement. *See* Dkt. No. 65 Ex. J ("Amended Deal Sheet" or "ADS"). Padell was a signatory to this agreement. *Id.* at 2. Like the March 11, 2011 Deal Sheet, this agreement governed the provision of financing "to the 'NewCo' to produce . . . 'Salesman.'" *Id.* ¶ 1. The Amended Deal Sheet provided that Qube Films would "release [$500,000 in] deposited funds . . . in exchange for [a] pre advice of a $6MM bank instrument." *Id.* ¶ 2. This agreement further provided that "Qube Films [would] release the $500,000 immediately upon receipt of the pre advice." *Id.* That same day, "Cube Productions, Inc." issued a wire transfer in the amount of $510,246.15 to the Escrow Account. *See* Dkt. No. 65 Ex. Q at 1.

On March 14, 2011, Kelly and Soofi issued Escrow Instructions to Padell on behalf of Kelly Films and Qube Films indicating that $510,000 had been deposited into the Escrow Account. *See* Dkt. No. 65 Ex. K ¶ 1; PCS ¶ 60. Kelly and Soofi indicated in these instructions that Qube Films and Kelly Films would be receiving a "Pre-Advice" for $3 million from Ark Capital and Grier Enterprises. Dkt. No. 65 Ex. K ¶ 2. According to the Escrow Instructions, Qube Films and Kelly Films would "make a determination of acceptance or rejection" of this pre-advice and, "[u]pon acceptance . . . consent[] to release of the escrow funds . . . to the Funder." *Id.* ¶¶ 2-3.

On March 15, 2011, Kelly, Soofi, and Padell received the "pre-advice" via email. *See* Dkt. No. 65 Ex. L; *id.* Ex. M. On the same day, Padell received an email from Grier Enterprises

4

advising him that "QUbe [sic] Films [wa]s satisfied that the conditions of the escrow instruction terms have been met" and that Qube would "be sending a confirmation of such." *Id.* Ex. O. Subsequently, Kelly and Soofi sent a letter to Padell, "instruct[ing] escrow to be released in full . . . . in accordance to the Pre Advice reference number: 1253110315CIBGRUMMAXXX0465001542 and dated March 15, 2011." *Id.* Ex. N. Upon receiving these instructions, Padell did not verify that the "Conditions Precedent" described in the Escrow Agreement had been fulfilled before releasing funds. PCS ¶ 70.

On March 16, 2011, $500,000 was wired from the Escrow Account to Grier Enterprises. *See* Dkt. No. 74 Ex. G. The following day, $10,000 was wired from the Escrow Account to Padell's personal bank account. *Id.* Thereafter, Kelly and Soofi advised Padell via email that they "d[id] not authorize any further release of escrow above and beyond the initial $510,000 . . . without additional written correspondence." *Id.* Ex. L. Nevertheless, a further $100,000 was withdrawn from the Escrow Account on March 18, 2011, and a further $50,000 was withdrawn on March 21, 2011. *See id.* Ex. G. Funds continued to be withdrawn by entities associated with Grier and Padell through May 2011. *Id.* at 1-3.

On April 1, 2011, Kelly emailed Padell inquiring about "the balance of [the] escrow account for the film project, Salesman." Dkt. No. 74 Ex. F. at 2. Grier, Managing Director of Grier Enterprises, responded that Padell would send the account statements. *Id.* On April 5, 2011, Soofi sent Padell another email reiterating the request for the escrow account balance. *Id.* at 3. An additional April 5, 2011 email from Kelly to Padell reads: "As signatory to our escrow agreement, I need to speak with you right away about the status of the account. This is very important and I do require you to call me be [sic] right away." *Id.* at 8. At the same time, Kelly sent a follow-up email to Mr. Grier. *Id.* at 4. On April 6, 2011, Kelly sent yet another email

requesting information about the escrow account balance to Vaughn Richmond, the Managing Director of Ark Capital. *Id.* at 5. At no point did Padell respond to Kelly or Soofi. PCS ¶ 71.18. Approximately two years thereafter, Plaintiffs filed this suit. *See* Dkt. No. 1.

## III. DISCUSSION

The Amended Complaint raises claims of fraud, breach of contract, breach of fiduciary duty, conversion, negligence, and gross negligence against Defendant Padell and his company. Am. Comp. ¶¶ 47-63. In their motion for summary judgment, Defendants argue that (1) Padell made no false representations and thus did not commit actionable fraud; (2) Padell satisfactorily discharged his contractual and fiduciary duties; (3) Plaintiffs are not entitled to consequential or punitive damages; (4) Plaintiffs did not suffer any compensatory damages; and (5) Plaintiffs' negligence and gross negligence claims are improper. The Court will discuss each of these topics in turn. Pursuant to the choice of law clause in the Escrow Agreement, the Court will apply New York law.[2] *See* Escrow Agreement § 15.

### A. Fraud

To demonstrate fraud under New York law, a plaintiff must show that the "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant[] intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss." *Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 195 (N.Y. 2007). "A fraud claim should be dismissed . . . when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract." *First Bank of Ams. v. Motor*

---

[2] To the extent that tort claims are not governed by the choice-of-law clause, the parties agree that New York law governs because the allegedly tortious conduct occurred in New York, where Defendants are domiciled. *See* Dkt. No. 65 Ex. Q; Br. at 19; Opp. Br. at 13; *see also Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 683-85 (N.Y. 1985); *Burnett v. Columbus McKinnon Corp.*, 887 N.Y.S.2d 405, 407-08 (App. Div. 2009).

6

*Car Funding, Inc.*, 690 N.Y.S.2d 17, 20-21 (App. Div. 1999). However, a party may maintain a separate fraud claim if it alleges "that it was induced to enter into a transaction because a defendant misrepresented material facts" other than its intent to perform. *Id.* at 21.

In describing their fraud claim, Plaintiffs allege that Padell "lied to Plaintiffs repeatedly about the safekeeping of funds and the manner in which Plaintiff's [*sic*] own funds were distributed, in violation of written agreements and an Escrow Agreement." Am. Comp. ¶ 62. According to the Plaintiffs, it was the "apparent safeguards provided by the Escrow Agreement . . . [that] created a false sense of security that led Plaintiff's [*sic*] to provide $900,000 in funding for their own Project." *Id.* ¶ 63. In support of their motion for summary judgment, Defendants point to an absence of evidence of any false representation inducing Plaintiffs to enter into the Escrow Agreement. Br. at 19-20. Plaintiffs respond by reiterating that Padell's "role acting as an escrow agent was . . . the key consideration for Plaintiffs to entering [*sic*] into a financing arrangement." PCS ¶ 19. A false or insincere promise to perform contractual obligations does not constitute fraud. *See First Bank of Ams.*, 690 N.Y.S.2d at 20-21. Plaintiffs concede as much when they admit that "the present dispute is exclusively based on Defendant Bert Padell's failure to comply with his escrow duties and obligation[s]." PCS ¶ 27.

Because Plaintiffs' only alleged misrepresentation involves Padell's insincerity in "promis[ing] to perform under the contract," *First Bank of Ams*, 690 N.Y.S.2d at 20-21, there is "no genuine dispute as to any material fact" and Defendants are "entitled to judgment as a matter of law" on Plaintiffs' fraud claims. Fed. R. Civ. P. 56(a).

### B.   Breach of Contract and Breach of Fiduciary Duty

To prevail on a breach of contract claim, a plaintiff must show that there was a valid contract, the plaintiff performed the contract, the defendant breached the contract, and the breach

caused damages to the plaintiff. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011); *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 239 (App. Div. 2010). Similarly, a breach of fiduciary duty is established by demonstrating the existence of a fiduciary duty, breach of that duty, and "damages [to the plaintiff] as a result of the breach." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009) (quoting *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986)). "Under New York law, an escrow agreement creates a fiduciary relationship between the escrow agent and the parties to the escrow transaction." *Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 728 (S.D.N.Y. 2014) (citing *Greenapple v. Capital One, N.A.*, 939 N.Y.S.2d 351, 352 (App. Div. 2012)). The scope of an Escrow Agent's fiduciary duty is defined by the scope of its contractual duty under the Escrow Agreement. *See id.* at 729 (if an Escrow Agent "act[s] in accordance with its obligations under the escrow agreement, it has not breached its fiduciary duty").

Plaintiffs allege that Defendants breached their contractual and fiduciary duties in two ways. First, Plaintiffs argue that Defendants failed to verify that certain conditions precedent had been met before disbursing escrowed funds. Opp. Br. at 12. Second, Plaintiffs argue that Defendants disbursed funds to unauthorized parties. *Id.* Defendants argue that they had no obligation to verify the conditions precedent and that they were authorized to disburse funds to the relevant parties. Br. at 14. The Court will address each of these arguments in turn.

> 1. **"Duty to Verify"**

"[P]arties to an escrow agreement cannot impose upon [the escrow agent] any obligations in addition to its limited duties under the express terms of its contract." *H & H Acquisition Corp. v. Fin. Intranet Holdings*, 669 F. Supp. 2d 351, 363 (S.D.N.Y. 2009) (internal quotation marks omitted); *see also* Escrow Agreement § 9(a) ("The duties and obligations of the Escrow Agent

shall be determined solely by the express provisions of this Agreement."). As a matter of contract interpretation, if a contractual provision is "complete, clear and unambiguous . . . [it] must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).

Plaintiffs argue that there is a genuine issue of material fact as to whether Defendants "had the contractual duty to verify that the [Conditions Precedent] . . . were met, prior to releasing the funds." Opp. Br. at 12. The plain language of the Escrow Agreement belies the existence of any such duty. Section 5(a) of the Escrow Agreement provides that the "Escrow Agent shall . . . disburse the Escrow Property subject to the *Depositor instructing* Escrow Agent that the 'Conditions Precedent' are satisfied." (emphasis added). That agreement further provides that the "Escrow Agent shall incur no liability . . . for having acted in accordance with instructions on which it is authorized to rely." *Id.* § 5(d). Finally, the agreement specifies that the "Escrow Agent shall not have any responsibility to determine the authenticity or validity of any . . . instruction . . . delivered to it by any party." *Id.* § 9(d). These provisions unambiguously demonstrate that the *Depositors* (that is, Plaintiffs) had the obligation to confirm satisfaction of the conditions precedent, and that Padell, as Escrow Agent, had no "responsibility to determine the . . . validity of" their instructions before releasing funds. *Id.*

2. **Unauthorized Disbursements**

Nevertheless, Plaintiffs further argue that there is a genuine issue of material fact as to whether Defendant Padell "was authorized to direct the [escrowed] funds as he did." Opp. Br. at 12. In support of this argument, Plaintiffs point to the language of the Escrow Agreement and the Amended Deal Sheet. The Escrow Agreement provides that funds were to be paid to "banking coordinates . . . provided [by Plaintiffs] within 5 business days of Conditions Precedent

9

being satisfied." § 5(b)(ii). The Amended Deal Sheet, entered into several days after the Escrow Agreement and to which Padell was a signatory, specifies that such funds "be provided to the 'NewCo.'" *See* Dkt. No. 65 Ex. J ¶ 1. Instead, bank records demonstrate that in March 2011, $500,000 of the Escrow Funds went to Grier Enterprises, $120,000 went to Padell, and $40,000 went to Napoleon Grier, Managing Director of Grier Enterprises. *See* Dkt. No. 74 Ex. G at 1. Plaintiffs also point to a March 16, 2011 email from Kelly to Padell indicating that Plaintiffs "d[id] not authorize any further release of escrow above and beyond the initial $510,000." Dkt. No. 74 Ex. F at 1. Despite this instruction, at least nine withdrawals from the Escrow Account to Padell or Grier were executed after the $510,000 withdrawal. *See* Dkt. No. 74. Ex. G. at 1-3. During this period, Plaintiffs attempted repeatedly and unsuccessfully to contact Padell to discuss the escrow account. *See* Dkt. No. 74 Ex. F at 2-8.

Defendants argue that they are nevertheless entitled to summary judgment because liability under the Escrow Agreement is limited to "gross negligence or willful misconduct." Escrow Agreement § 9(n); Br. at 14-15. "[C]onstruing all evidence in the light most favorable to the non-moving party," *see Ruggiero*, 467 F.3d at 173, disbursing money to parties other than the party designated in the Amended Deal Sheet, personally appropriating $120,000, continuing to withdraw funds after written notice that further withdrawals were not authorized, and failing to respond to Plaintiffs' repeated inquiries could demonstrate "gross negligence or willful misconduct" such that a jury "could return a verdict" in Plaintiffs' favor. *See Nabisco*, 220 F.3d at 45 (quoting *Anderson*, 477 U.S. at 248). As a result, Defendants motion for summary judgment is denied with respect to Plaintiffs' breach of contract and breach of fiduciary duty claims.

## C. Consequential and Punitive Damages

While Plaintiffs seek over $2 million in damages, Defendants point to the provision in the Escrow Agreement disclaiming liability for consequential and punitive damages. Br. at 21; Escrow Agreement § 9(h)(ii) ("In no event shall Escrow Agent be liable . . . for any consequential, punitive or special damages."). Such a provision is enforceable under New York law so long as the parties to the contract had equal bargaining power. *See DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 317-18 (S.D.N.Y. 2002) (citing *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 507 (N.Y. 1994). Plaintiffs make no argument that § 9(h)(ii) is not enforceable under this standard. Indeed, they admit that they "knowingly, willingly and voluntarily executed the Escrow Agreement following the advice of counsel" and "had no objection to the terms and provisions" of that agreement. PCS ¶¶ 40, 41. Based on this admission, the Court is satisfied that the Escrow Agreement was entered into voluntarily by parties of equal bargaining power, and that its plain language precludes Plaintiffs from recovering consequential and punitive damages for breach of the Escrow Agreement.

As a result, it is necessary to categorize the damages sought by Plaintiffs, who seek to recover the $900,000 they deposited into the Escrow Account, $250,000 of expenses incurred developing the movie "Salesman," and $1 million in punitive damages. *See* Am. Comp. at 24-25. Compensatory damages consist of "money that the breaching party agreed to pay under the contract." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007)). By contrast, consequential damages "do not directly flow from the breach." *Id.* (quoting *Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989) (internal quotation marks omitted).

Plaintiffs' request for punitive damages is clearly barred by section 9(h)(ii) of the Escrow Agreement, while its demand for the $900,000 deposited into the Escrow Account and subsequently lost is clearly permissible. The closer question is the categorization of the $250,000 spent on "Salesman." According to Plaintiffs, this figure represents "out-of-pocket expenses" lost when the production of the movie fell through. *See* Dkt. No. 74 Ex. D ("Soofi Depo.") 143:8-44:21. Soofi concedes that these losses "indirectly" resulted from Defendants' breach due to Plaintiffs' inability to secure other financing for the movie. *Id.* at 143:15-25. Because out-of-pocket expenses invested in the failed "Salesman" project are "one step removed from the naked performance promised by the defendant" under the Escrow Agreement (namely, to disburse $900,000 under the terms of the agreement), they are properly categorized as consequential damages. *PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 374 (S.D.N.Y. 2014) (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 177 (2d Cir. 2000)). As Plaintiffs are precluded from seeking consequential damages, Defendants have demonstrated that there is "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law" on Plaintiffs' claims for $250,000 in consequential and $1 million in punitive damages. Fed. R. Civ. P. 56(a).

### D. Compensatory Damages

Breach of contract, breach of fiduciary duty, and conversion claims require a showing of damages to the plaintiff caused by the defendant's actions. *See Diesel Props*, 631 F.3d at 52; *Meisel*, 651 F. Supp. 2d at 114 (quoting *Whitney*, 782 F.2d at 1115); *see also Colavito v. New York Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006). While no one disputes that $900,000 deposited into the Escrow Agreement was withdrawn, Defendants argue that there is an absence of evidence that *Plaintiffs* lost this money. Br. at 20-21. In support of this argument,

Defendants point out that "Cube Productions, Inc." wired the disputed $900,000 into the Escrow Account. *See* Dkt. No. 65 Ex Q. Plaintiffs respond in their counterstatement by pointing to deposition testimony about the relationship between Qube Films, Soofi, and Cube Productions, Inc. *See* PCS ¶ 79; Soofi Depo. 137:14-24.

In his deposition, Soofi testified that "Cube with a C is my company. It's me and my brother. . . . It's legal name of [sic] Cube Productions. Our bank account is under C-U-B-E Productions, Inc." Soofi Depo. 137:19-24. Later in the deposition, he explained that Qube Films and Cube Productions, Inc. were the same company, but that "we usually do business under Qube Film." *Id.* 188:6-9. He went on to testify that "we started as C-U-B-E and then . . . we change [sic] it and . . . without changing the whole legal Cube Production, we just changed the business name to Q-U-B-E." *Id.* 188:10-15. He further noted that he "registered both" companies and that "everyone knows us just like Qube Film." *Id.* 188:17-18. He reiterated that "we started as C-U-B-E . . . when we opened our bank account it was C-U-B-E . . . . but we change [sic] it after . . . we changed it to Q-U-B-E." *Id.* 188:20-25; 189:2-4. He concluded by insisting that Qube Films and Cube Productions, Inc. were "[t]he same entity." *Id.* 189:4.

Plaintiffs do not address this issue in their legal memorandum opposing summary judgment. Opp. Br. at 16. Nevertheless, "construing all evidence in the light most favorable to the non-moving party," *see Ruggiero*, 467 F.3d at 173, these facts could be interpreted to show that "Cube Productions, Inc." changed its name to "Qube Films Ltd," and that they are, in fact, the same entity. In other words, there is sufficient evidence for a jury to find that Qube Films suffered $900,000 in damages. *See Nabisco*, 220 F.3d at 45 (quoting *Anderson*, 477 U.S. at 248). For this reason, Defendants have failed to meet their burden of showing that there is no genuine dispute of material fact as to damages suffered by Plaintiff Qube Films.

Plaintiffs Kelly Films and Soofi, however, are differently situated. Plaintiffs concede that Kelly Films did not deposit any money into the Escrow Account and did not suffer any compensable damages. *See* PCS ¶¶ 80-81. As a result, Defendant have carried their burden of showing that there is "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law" for claims brought by Kelly Films. Fed. R. Civ. P. 56(a).

With regard to Soofi, it is undisputable from the record that "Cube Productions, Inc." and "Qube Films Ltd" are corporations.[3] "[C]onstruing all evidence in the light most favorable to the non-moving party," *see Ruggiero*, 467 F.3d at 173, Soofi is at best a shareholder in these closely held corporations. *See* Soofi Depo. 137:19-20. Although it is not clear whether standing to sue on behalf of a corporation falls within the scope of a choice-of-law clause, *see Lerner v. Prince*, 119 A.D.3d 122, 128 (N.Y. App. Div. 2014), both New York and Canadian law prohibit shareholders of a corporation from suing directly for "wrongs done to the corporation." *See, e.g., In re Lehman Bros. Holdings Inc.*, 515 B.R. 171, 176 (Bankr. S.D.N.Y. 2014) (citing *Hercules Mgmt. Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165 ¶ 59 (Can.)); *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) (quoting *Fifty States Mgmt. Corp. v. Niagara Permanent Sav. & Loan Assoc.*, 396 N.Y.S.2d 925, 927 (App. Div. 1977)). Although cases on this topic are often framed in terms of standing, the underlying inquiry is one of damages. Under New York law, for example, whether a shareholder has standing to bring a direct suit on behalf of a corporation turns on whether the shareholder "suffered the alleged harm." *See Yudell v. Gilbert*, 949 N.Y.S.2d 380, 384 (App. Div. 2012) (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004)). Whether conceived of in terms of damages or in terms of standing, Cube Productions Inc. or Qube Films Ltd, but not Soofi, has suffered the $900,000 loss

---

[3] Qube Films, Ltd. is a Canadian company, *see* Am. Comp. at 1; PCS ¶ 79, and "Ltd" is a Canadian designation for a corporation. *See Celi v. Canadian Occidental Petroleum Ltd.*, 804 F. Supp. 465, 467 (E.D.N.Y. 1992).

in dispute. Because Soofi has not suffered any compensable damages, he lacks standing to sue directly on behalf of Qube Films[4] and Defendants have thus demonstrated that they are "entitled to judgment as a matter of law" with regard to his claims. Fed. R. Civ. P. 56(a).

### E. Negligence and Gross Negligence

Finally, Defendants seek summary judgment on Plaintiffs' negligence and gross negligence claims. As an initial matter, Plaintiff's ordinary negligence claim is barred by § 9(n) of the Escrow Agreement, which disclaims liability for anything other than "gross negligence or willful misconduct." With respect to gross negligence, tort claims are precluded as duplicative if "the basis of a party's claim is a breach of . . . contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort." *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). This is the case, for example, where a party brings a negligence action for negligent exercise of contractual duties. *See Fixed Income Shares: £Series M v. Citibank N.A.*, No. 14-CV-9373 (JMF), 2015 WL 5244707, at *13 (S.D.N.Y. Sept. 8, 2015). As noted above, the scope of an Escrow Agent's fiduciary duty is defined by the scope of its contractual duty under the Escrow Agreement. *See DiJoseph*, 37 F. Supp. 3d at 729. Plaintiffs concede here that "the present dispute is exclusively based on Defendant Bert Padell's failure to comply with his escrow duties and obligation[s]." PCS ¶ 27. Because Plaintiffs' claims of negligence and gross negligence "merely seek[] to obtain the benefit of the contractual bargain" set forth in the Escrow Agreement, *Bayerische Landesbank*, 692 F.3d at 58, their gross negligence action is duplicative and Defendants are entitled to summary judgment on that claim.

---

[4] There is no contention here, nor could there be, that Soofi raises derivative claims on behalf of Qube Films. *See* N.Y. Bus. Corp. Law § 626(c) (McKinney); *Marx v. Akers*, 666 N.E.2d 1034, 1036-37 (N.Y. 1996).

IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion is GRANTED with respect to all claims brought by Plaintiffs Navid Soofi and Kelly Films, as well as Plaintiff Qube Films' fraud, negligence and gross negligence claims and claims for consequential and punitive damages. Defendants' motion is DENIED in all other respects. Plaintiff Qube Films' breach of contract, breach of fiduciary duty, and conversion claims survive, but Plaintiff is limited to compensatory damages on these claims.

Per Rule 5.A of the undersigned's Individual Practices in Civil Cases, the parties remaining in the case shall file their joint pretrial report within 14 days of the date of this order. The parties shall also appear for a scheduling conference on Tuesday, April 12, 2016 at 2:00 p.m.

This resolves Dkt. No. 64.

SO ORDERED.

Dated: March __, 2016
New York, New York

_____
ALISON J. NATHAN
United States District Judge