UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 0 1 2016

Qube Films Ltd. *et al.*,

      Plaintiffs,

–v–

Bert Padell *et al.*,

      Defendants.

13-CV-8405 (AJN)

MEMORANDUM AND ORDER

ALISON J. NATHAN, District Judge:

  Plaintiffs in the above-captioned case moved *in limine* to preclude testimony from Defendants' expert witnesses pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. *See* Dkt. No. 67. For the reasons articulated below, Plaintiffs' motion is denied.

## I. BACKGROUND

  On November 25, 2013, Qube Films Ltd., Navid Soofi, and Matt Kelly Films Ltd. ("Plaintiffs") filed the instant action against Bert Padell and Padell and Co. ("Defendants"). *See* Dkt. No. 1. Plaintiffs' allegations are detailed more fully in the accompanying Memorandum and Order on Defendants' motion for summary judgment. Upon Defendant Padell's disclosure that he suffered from Parkinson's Dementia Complex, the Court appointed a guardian *ad litem*. *See* Dkt. No. 45; Dkt. No. 54 at 2. On February 2, 2015, Padell served Plaintiffs with notice of his intent to offer testimony regarding his mental capacity from two experts, Dr. Hausknecht and Dr. Barr. *See* Br. at 1; *id.* Ex. 1 at 1. According to this notice, these experts would testify that Padell's Parkinson's Dementia Complex resulted in "decreased cognitive function during the

1

relevant time period related to the transaction at issue." *Id.* Ex. 1 at 1. Plaintiffs filed a motion *in limine* the exclude this testimony under Rule 702 and *Daubert*. *See* Dkt. No. 67.

## II. LEGAL STANDARD

The party seeking to introduce expert testimony "bears the burden of establishing its admissibility by a preponderance of the evidence." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003). Federal Rule of Evidence 702 allows expert testimony if:

> (a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In evaluating expert testimony under this standard, the court acts as a gatekeeper to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

The reliability inquiry envisioned by *Daubert* is "a flexible one," *id.* at 594, and the factors to be considered "depend[] upon the particular circumstances of the particular case at issue." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). In *Kumho*, the Supreme Court pointed to factors a court *may* consider in conducting this inquiry, including whether a theory has been subject to peer review and publication, whether there is a known error rate, whether there are governing standards, and whether the method enjoys "general acceptance" within a "relevant scientific community." *Id.* at 149-50 (citing *Daubert*, 509 U.S. at 592-594). However, these factors do not constitute a "definitive checklist or test." *Id.* at 150 (citing *Daubert*, 509 U.S. at 593).

Courts have recognized that certain of these *Daubert* factors are less readily applied to psychological and psychiatric evidence, where "the research, theories and opinions cannot have

2

the exactness of [other] science methodologies." *See, e.g., Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297 (8th Cir. 1997). Acknowledging that not all fields of expertise are equally quantifiable, the Second Circuit has emphasized that courts evaluating expert testimony should focus on "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). This "flexible *Daubert* inquiry gives the . . . court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony." *Id.* at 267.

Even in light of *Daubert* and its progeny, "exclusion [of expert testimony] remains 'the exception rather than the rule.'" *Vazquez v. City of New York*, No. 10-CV-6277 (JMF), 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014) (quoting *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012)). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## III. DISCUSSION

Plaintiffs do not contest Padell's diagnosis of Parkinson's Dementia Complex, which an independent medical expert confirmed. *See* Dkt. No. 54 at 5.[1] Instead, Plaintiffs challenge testimony "regarding the defendant's mental acuity *at the time of the transactions in question.*"

---

[1] Plaintiffs' and Defendants' experts followed the same diagnostic methodology, which included a medical history interview, patient observation, a physical examination, and administration of standard psychological tests such as the Mini-Mental State Examination (MMSE). *See* Dkt. No. 54 at 5; Dkt. No. 67 Ex. 2 at 5-9; Dkt. No. 72 Ex. 2 at 2-4. This methodology is routinely accepted under *Daubert*. *See United States v. Finley*, 301 F.3d 1000, 1008-09 (9th Cir. 2000); *Schoolcraft v. City of New York*, No. 10-CV-6005 (RWS), 2015 WL 6444620, at *1-2 (S.D.N.Y. Oct. 23, 2015).

3

Br. ¶ 7 (emphasis added).  Plaintiffs argue that the proffered testimony of Defendants' experts as to Padell's mental state in 2011 lacks "any indication whatsoever of the scientific foundation, the methodology, the factual basis or contemporaneous data that support their opinions regarding the defendant's alleged diminished cognitive function . . . back in March 2011." *Id*. ¶ 6.  Plaintiffs further contend that the experts' conclusions "are not based on any empirical evidence, as they do not recite, summarize, or even identify any supporting data at all." *Id*. ¶ 4.  Before evaluating this argument, the Court will describe Dr. Barr and Dr. Hausknecht's findings.

### A.   Dr. Barr's Report

Dr. Barr evaluated Padell in July 2014.  *See* Dkt No. 67 Ex. 2 at 5.  During this evaluation, he conducted a medical history interview with Padell and his wife.  This interview revealed that Padell had begun experiencing symptoms of Parkinson's, including a "slight tremor in his lower jaw," as early as 2004.  *Id*.  The interview further revealed that Padell began experiencing "[r]esting tremors of the upper extremities" and "decline in [] memory and other cognitive abilities" in approximately 2009.  *Id*.  Dr. Barr also consulted reports by other physicians treating Padell.  For example, Dr. Barr reviewed a May 2013 letter from a Dr. Tyberg indicating that Padell had been "under his care for treatment of Parkinson's disease for several years" and an October 2013 letter from a Dr. Rapoport indicating that he had been overseeing the "neurological care of Mr. Padell from November 2012 onward." *Id*. at 7.  Finally, Dr. Barr administered no fewer than twelve standard psychological tests, including the MMSE.  A comparison of Padell's July 2014 results to previous results suggested, according to Dr. Barr, "some additional decline over recent months." *Id*.

Based on his interview with Padell, an evaluation of Padell's medical records, and the comparative performance on standard psychological tests, Dr. Barr concluded that Padell had

4

"undergone a drastic decline in his cognitive and behavior functioning over the past several years." *Id.* at 9. Dr. Barr further concluded that "[b]ased on the reported time course of symptoms in this case, the first signs of Parkinson's disease and associated cognitive changes," including "deficits in judgment, decision making, and memory skills," were "present well in advance of the fraudulent activities alleged in 2011." *Id.*

### B. Dr. Hausknecht's Report

Dr. Hausknecht, chief of the Department of Neurology at St. John's Episcopal Hospital in New York, has evaluated Padell on a number of occasions beginning in November 2013. *See* Opp. Br. at 2; Dkt. No. 72 Ex. A at 3; *id.* Ex. B at 2. In his initial interview with Padell on November 7, 2013, Dr. Hausknecht noted that Padell had begun experiencing "shaking of his left upper extremity" approximately two years prior, or sometime in 2011. Dkt. No. 72 Ex. B at 2. This shaking became more severe and spread to Padell's "right upper extremity and both lower extremities" around May 2013. *Id.* At the time of his evaluation in November 2013, Padell exhibited "difficulty swallowing, difficulty chewing, and sometimes ha[d] excessive saliva which drain[ed] out of the right side of his mouth." *Id.*

Dr. Hausknecht again examined Padell in March 2014 and found his condition to have declined. *See id.* Ex. D. In May 2014, Dr. Hausknecht ordered an MRI, which revealed that Padell suffered from "vascular atherosclerotic" dementia which had caused "chronic white matter changes" in Padell's brain. *See id.* Ex. E, *id.* Ex. F at 2; *id.* Ex. G at 5:20-21. Based on his interviews with Padell, his observations through the course of his treatment, and the results of psychological tests and the MRI, Dr. Hausknecht concluded that Padell "had difficulties in cognition" affecting his "memory, interpretation, understanding, [and] mathematical calculations" dating to approximately 2009. *Id.* Ex. G at 8: 23-25.

5

### C.  Analysis

Plaintiffs argue that Dr. Barr and Dr. Hausknecht's conclusions "are not based on any empirical evidence" and "do not . . . identify any supporting data at all." Br. ¶ 4. This argument is unpersuasive in light of the extensive data described by Defendants' experts, including Padell's medical history, psychologist test results, an MRI, reports from treating physicians, and observations of progressive cognitive decline, some of which predate the initiation of the instant action. Dr. Barr and Dr. Hausknecht's experience in the field of neurology further undermines Plaintiffs' argument. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (finding a doctor's clinical experience and educational background sufficient to satisfy *Daubert*).

The information presented by Defendants is sufficient to satisfy the Court that the proffered expert testimony about Padell's psychological condition in 2011 is "grounded on sufficient facts or data." *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702). The accuracy with which Defendants' experts can estimate the severity of Padell's Parkinson's Dementia Complex as of March 2011 based on this data "go[es] to the weight, not the admissibility, of [the] testimony." *McCullock*, 61 F.3d at 1044. As the Supreme Court has acknowledged, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### IV.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion to preclude testimony from Defendants' experts is denied. This resolves Dkt. No. 67.

SO ORDERED.

Dated: March ___, 2016
New York, New York

_____
ALISON J. NATHAN
United States District Judge